IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES PITTS,                        *

Plaintiff                           *

v                                   *     Civil Action No. PWG-17-3546

DOLPH DRUCKMAN and                  *
WEXFORD HEALTH SOURCES, INC.,
                                    *
Defendants
                                  ***

## MEMORANDUM OPINION

Plaintiff James Pitts, an inmate at Roxbury Correctional Institution, has brought this civil rights action against the Maryland correctional system's health care provider, Wexford Health Sources, Inc. ("Wexford"), and one of its physicians, Dr. Dolph Druckman (collectively, "Defendants"). The suit alleges Defendants violated the Eighth Amendment's prohibition on cruel and unusual punishment, as incorporated in the Fourteenth Amendment, through their deliberate indifference to Plaintiff's medical needs. Compl., ECF No. 1. Defendants have filed a Motion to Dismiss or, in the Alternative, for Summary Judgment.[1] ECF No. 16.

I conclude that Plaintiff has failed to state a claim against Wexford because the Complaint does not allege that Wexford knew or had constructive knowledge that the medical care provided to Plaintiff was deficient. Accordingly, the claim against Wexford is dismissed. I also conclude that the record does not establish, as a matter of law, that Druckman had the subjective knowledge required for an Eighth Amendment violation under these circumstances. For this reason, with regard to the claim against Druckman, I grant summary judgment for Defendants.

---

[1] Plaintiff has filed a Response in Opposition, and Defendants have submitted a Reply. ECF Nos. 20, 21. The matter is now ripe for review. The Court finds a hearing in these matters unnecessary. *See* Local Rule 105.6 (D. Md. 2018).

## BACKGROUND

### A. Plaintiff's Complaint

Plaintiff's unsworn Complaint alleges that "as early as May 3, 2016," he had been complaining to medical staff of a urethral stricture. Compl. 4. On that date, Plaintiff was seen by Physician's Assistant Wanda Lumpkins "when it was determined that [Plaintiff] was positive for low urine output and decreased urine stream." *Id.* Although Plaintiff was told that a urology consult would be considered, the consult never occurred. *See id.* at 4, 6. Plaintiff was prescribed unspecified medication, which he reports did not improve the condition. *Id.* On July 22, 2016, he was told his "condition did not warrant any additional urology evaluation." *Id.* at 5.

Plaintiff states that he subsequently "complained of a split urine stream as a result of his condition." *Id.* at 4. He reports that his "condition" had become worse over time, and that the advice of medical providers to increase his fluid intake had not improved the problem. *Id.* at 4-6.

Plaintiff filed suit in this Court on November 23, 2017, seeking relief under 42 U.S.C. § 1983. *Id.* at 7-8. The Complaint states that "as of [the date of filing], and for the past year, Mr. Pitts is experiencing lower abdominal pain and pain while urinating." *Id.* at 6. Plaintiff contends that had he been referred to a urologist, "he may have been able to receive proper treatment." *Id.* He requests that he be "seen by a urologist in a timely manner" and awarded $5.5 million in damages. *Id.* at 7.

### B. Defendants' Motion & Exhibits

Defendants have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, which is supported by Plaintiff's certified medical records and an affidavit from Defendant Druckman. ECF Nos. 16, 16-4, 16-5.

Druckman's affidavit refutes Plaintiff's contention that he had a urethral stricture as early as May 3, 2016. Druckman Aff. 2, ECF No. 16-5. It states that Druckman examined Plaintiff in January 2016, after Plaintiff complained of a split urine stream, which, according to Druckman, "may be benign or symptomatic of other underlying conditions." *Id.* According to Druckman:

> Plaintiff was negative for other accompanying symptoms such as: change in urine color, cloudy urine, dysuria, flank pain, foul odor in urine, frequency, reduced volume, groin mass, hematuria, hesitancy, incontinence, nocturia, passage of stones, polyuria, or urgency. Plaintiff's exam, and his urinalysis and urine cultures, were otherwise unremarkable. In Affiant's opinion to a reasonable degree of medical probability Plaintiff's reported condition of only having a split urinary stream was a condition to be monitored but did not warrant further urology intervention. Plaintiff was not clinically assessed as having a split urine stream and was not diagnosed with a urethral stricture.

*Id.* Defendants have not included Plaintiff's medical records from January 2016.

Records of Plaintiff's subsequent examinations indicate he was seen by Physician's Assistant Crystal Jamison on March 23, 2016, at which time he reported he was "not experiencing any relief of split [urine] stream with [his] current treatment" of Flomax, which he began taking January 5, 2016.[2] Medical Rs. 2, ECF No. 16-4. Jamison noted that Plaintiff denied experiencing hematuria (blood in the urine) and that "previous urine cultures and [urinalysis] [were] unremarkable. No abdominal or suprapubic tenderness. GU [genitourinary] system addressed and examined by RMD [regional medical director] in January with unremarkable exam findings." *Id.* Jamison noted that she would discuss Plaintiff's "concerns with RMD to determine if additional

---

[2] Flomax is a brand name for the drug Tamsulosin, which "is used in men to treat the symptoms of an enlarged prostate (benign prostatic hyperplasia or BPH) which include difficulty urinating (hesitation, dribbling, weak stream, and incomplete bladder emptying), painful urination, and urinary frequency and urgency." *Tamsulosin*, MedlinePlus, https://medlineplus.gov/druginfo/meds/a698012.html (last visited Jan. 3, 2019).

evaluation is indicated." *Id.* There is no indication whether Jamison conferred with Druckman following this appointment.

On April 7, 2016, Plaintiff had a scheduled sick call appointment with Registered Nurse Carmen Griffith. *Id.* at 3. Plaintiff complained of a split stream of urine, and Griffith referred Plaintiff to a provider for this issue and advised him to request a sick call if his symptoms did not subside. *Id.*

On May 3, 2016, during a scheduled provider visit with Lumpkins, Plaintiff complained of split-stream urination and diminished urine output and requested that he be seen by a urologist. *Id.* at 4. Lumpkins recorded that Plaintiff was "[n]egative for change in urine color, cloudy urine, dysuria, flank pain, foul odor in urine, frequency, groin mass, hematuria, hesitancy, incontinence, nocturia, passage of stones, polyuria, [or] urgency."[3] *Id.* There is no indication in Lumpkins's notes that she submitted, or indicated she would submit, a request for a urology consult. *Id.* The notes do state that Plaintiff was to be referred to a provider in one week for "test of cure," but this appears to refer to Plaintiff's treatment for an unrelated bacterial infection in his stomach. *Id.* at 4-5.

On June 1, 2016, Plaintiff submitted a sick call request stating: "I was told that I was referred to see the [physician's assistant] two week[s] ago. I've been having pain in my stomach due to an ongoing bacterial infection. Also, I've been having problems with my urethra and would like to see a urologist." *Id.* at 5. The sick call request contains an illegible signature, indicating

---

[3] Dysuria refers to painful urination. *See Painful Urination (Dysuria)*, MayoClinic.org, https://www.mayoclinic.org/symptoms/painful-urination/basics/causes/sym-20050772 (last visited Jan. 2, 2019). Nocturia refers to the condition of waking up during the night to urinate. *See Nocturia*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/14510-nocturia (last visited Jan. 2, 2019). Polyuria refers to an excessive volume of urination. *See Excessive Urination Volume (Polyuria)*, Healthline.com, https://www.healthline.com/health/urination-excessive-volume (last visited Jan. 2, 2019).

4

that a provider reviewed the form the following day, but there is no indication of what action was taken regarding the sick call, nor is there a record of a visit with a medical provider on or around this date. *See id.*

On June 28, 2016, Plaintiff was seen by PA Jamison, who reported in her notes that Plaintiff was "not experiencing any relief of split stream with current treatment." *Id.* at 6. Her notes state:

> Apparently at a previous visit, a urology consult was discussed [but] never generated. He denies hematuria, dysuria, intermittent stream, pain, etc. [P]revious urine cultures and UAs unremarkable. No abdominal or suprapubic tenderness[.] GU system addressed and examined by RMD in January with unremarkable exam findings as well. Pt issues/concerns discussed with RMD to determine if additional evaluation is indicated. Per RMD, a spilt stream does not warrant any additional urology work up. . . . He was encouraged to increase fluid intake.

*Id.* No follow-up treatments or requests were noted in connection with Plaintiff's urination issues.[4]

Druckman states that Plaintiff did not register any further complaints about urinary issues until January 2017. *See* Druckman Aff. 3. On January 18, 2017, Plaintiff submitted a sick call request in which he stated, "I have a urological problem which has gotten worse over time. I am experiencing flank pain and dysuria and lower abdomen pain." Medical Rs. 7. Plaintiff stated that this problem started "[a] year ago. I have a documented history of it." *Id.* Plaintiff had a sick call the following day, but he told the nurse "that he has been seen numerous times over the same issues hence he decided to sign off" and forgo evaluation. *Id.* at 8.

Plaintiff again complained of a split urinary stream on July 17, 2017, during a medical appointment with Jamison concerning a skin condition. *See* Druckman Aff. 3; Medical Rs. 9. Jamison recorded that Plaintiff's only complaint was a split stream of urine and that Plaintiff

---

[4] A follow-up appointment with a provider was ordered in connection with his bacterial infection in his stomach. *Id.*

5

denied "dribbling, straining, weak stream, dysuria, hesitancy[,] hematuria[,] or incontinence." Medical Rs. 9. She noted that Plaintiff's concern was "previously discussed with RMD and UM with suggestions for monitoring for additional symptoms as split stream only did not warrant urology referral." *Id.* Nonetheless, Jamison referred Plaintiff to a doctor for a second opinion. *Id.*

On July 26, 2017, Plaintiff was seen by Dr. Mahboobeh Memarsadeghi, who submitted a request for a urology consult. *Id.* at 11-12. Memarsadeghi also ordered that Plaintiff receive a urine culture and urinalysis. *Id.* at 13.

On November 23, 2017, Plaintiff mailed his Complaint to the Clerk of this Court. Later, on December 12, 2017, Plaintiff had a urology consult with Dr. Laurence Scipio, who recommended that Plaintiff undergo a cystoscopy to evaluate a urethral stricture. *See* Medical Rs. 14-16. The request was approved, and the cystoscopy was performed by Scipio on January 10, 2018. *See id.* at 18-19, 22. After ruling out a possible diagnosis of urethral stricture, Scipio diagnosed Plaintiff as having chronic prostatitis[5] and prescribed medication to treat the problem. *See id.* at 22-24; Druckman Aff. 3.

Druckman avers that, in his opinion and "to a reasonable degree of medical probability[,] Plaintiff received appropriate care for his genitourinary condition. Plaintiff will continue to have access to medical staff at all times via the sick call process." Druckman Aff. 3.

**C. Plaintiff's Response**

In his Response in Opposition to Defendants' Motion, Plaintiff states that, by the time he reported further problems on January 18, 2017, his condition had become "much worse" and he was experiencing "intense pain." Pl.'s Opp'n 4, ECF No. 20-1. Plaintiff does not dispute

---

[5] Prostatitis refers to inflammation of the prostate. *See Prostatitis*, Nat'l Inst. of Diabetes & Digestive & Kidney Diseases, https://www.niddk.nih.gov/health-information/urologic-diseases/prostate-problems/prostatitis-inflammation-prostate (last visited Jan. 2, 2019).

6

Defendants' assertion that he voluntarily declined to go through with the medical appointment that was scheduled for January 19, 2017. Likewise, Plaintiff does not claim that he reported his urinary problems to medical providers on any occasions other than those noted by Defendants, nor does he allege that he complained to prison health providers of pain while urinating on any occasion other than his January 18, 2017 sick call request.

Plaintiff argues that Wexford was deliberately indifferent to his medical needs because its employees failed to follow Wexford's own process for utilization management review when Druckman denied Plaintiff's request without first presenting it to the collegial review committee. *See id.* at 13. Plaintiff further contends that Defendants' acknowledgement that "a split urine stream may be benign or *symptomatic of other underlying* conditions evince[es] that they knew of the seriousness of Mr. Pitts['s] condition." *Id.* at 14 (emphasis in original). Finally, Plaintiff contends that he has been harmed by Defendants' inaction because "[a]ccording to the Mayo Clinic, [p]rostatitis can cause infertility" and therefore "the defendants may have caused permanent damage to [Plaintiff's] reproductive organs." *Id.* at 14-15.

## STANDARD OF REVIEW

Defendants' dispositive motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings pursuant to Rule 12(d). If the court does so, "the motion must be

treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). Because Defendants have filed and relied on declarations and exhibits attached to their dispositive motion, the motion shall be treated, at least in part, as one for summary judgment.

Summary judgment is governed by Rule 56(a), which provides in relevant part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In analyzing a summary judgment motion, the court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Fed. Deposit Ins. Corp. v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). Because Plaintiff is proceeding *pro se*, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nonetheless, the court must also abide by the "affirmative obligation of the trial

judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## DISCUSSION

### A. Wexford and Supervisory Liability

I begin with the claim against Wexford. It is well established that the doctrine of respondeat superior does not apply to § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Hendrick v. Wexford Health Sources, Inc.*, 141 F. Supp. 3d 393, 400-01 (D. Md. 2015). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor "had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) "the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) "there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

Plaintiff's Complaint fails to allege that Wexford knew or had constructive knowledge of his allegedly deficient medical care, must less that there was "an affirmative causal link" between Defendants' failure to act and the alleged violation of Plaintiff's Eighth Amendment rights. Although Plaintiff's Response attempts to assign liability to Wexford, his argument only amounts

9

to a respondeat superior claim. Pl.'s Opp'n 13 (alleging that "Wexford violated [its] policy that they were/are bound by when their employee (Mr. Druckman), denied Plaintiff[']s urology consult"). Indeed, Plaintiff's acknowledgment that Wexford had a policy with which Druckman allegedly failed to comply indicates that Druckman was not acting with Wexford's knowledge and authorization, but was instead acting contrary to Wexford's wishes. For this reason, the claim against Wexford must be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## B. Druckman & Deliberate Indifference

I next consider the claim against Druckman. The Eighth Amendment, as incorporated by the Fourteenth Amendment, prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to "deliberate indifference" to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999).

"[D]eliberate indifference requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Id.* at 696 quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). In cases like this, there must be a showing that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed

to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). The subjective component is satisfied only where a prison official "subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *see also Jackson*, 775 F.3d at 178 ("[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference.").

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. The reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001). The patient's

right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

(1) January 2016 through June 28, 2016

Between January and June 2016, Plaintiff complained to medical providers of a split urine stream and, starting in May 2016, of low urine output and decreased urine stream. *See* Medical Rs. 2-6. During this time Plaintiff denied noticing blood in the urine or experiencing painful urination or a number of other possible serious problems associated with urination. *See id.* Druckman evaluated Plaintiff in January 2016, when Plaintiff's only reported urinary problem was a split stream. *See* Druckman Aff. 2. It is not clear whether Druckman was subsequently consulted by the medical providers evaluating Plaintiff between March and June 2016. *See* Medical Rs. 2, 6 (indicating that providers planned to or possibly did discuss Plaintiff's complaints with the regional medical director). Druckman avers that, based on his medical expertise, he concluded Plaintiff's symptoms did not warrant a urological consult. *See* Druckman Aff. 2.

It is doubtful that a split urine stream, low urine output, and decreased urine stream – absent pain, blood, or other urinary problems – amounts to an objectively serious medical condition for purposes of the Eighth Amendment. Nonetheless, assuming without deciding that such symptoms are objectively serious, Plaintiff has failed to demonstrate that Druckman acted with the requisite subjective mental state, as there is no indication that he recognized that his approach of waiting to see if further symptoms developed was improper. *See Rich*, 129 F.3d at 340 n.2 ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk.").

12

Moreover, although Plaintiff believes that Defendants' acknowledgement that his condition "may be benign or *symptomatic of other underlying* conditions" demonstrates that Defendants knew his condition might be serious and warranted referral to a urologist, Pl.'s Opp'n 14 (emphasis in original), I do not accept Plaintiff's suggestion that the word "symptomatic" connotes a need for immediate evaluation by a specialist. Plaintiff's interpretation improperly removes medical judgment from the equation. Take headaches, for example. Headaches might conceivably be symptomatic of a brain tumor or other serious neurological condition, but it is hardly a given that a primary care provider ought to immediately refer a headache sufferer to a neurologist for evaluation and testing.[6] Common sense suggests that a referral would be far more likely, and more appropriate, if the headaches were combined with other symptoms indicative of a serious neurological condition. Here, the record indicates that medical providers acted as one might expect; Plaintiff presented with a condition that could be benign or symptomatic of something worse, and the medical providers looked for other symptoms (like dysuria or hematuria) that might warrant further intervention. These facts do not support Plaintiff's § 1983 claim.

(2) June 29, 2016 through July 17, 2017

As to the period after June 2016, Plaintiff provides no reason to suggest that Druckman would have had knowledge of any developing condition, including the "lower abdominal pain and pain while urinating" that Plaintiff claimed to have suffered in the year preceding the filing of his Complaint. Compl. 6. According to the medical records that Plaintiff does not dispute, between June 29, 2016, and the sick call that precipitated his appointment with Dr. Memarsadeghi, Plaintiff submitted a single sick call request regarding his urinary problems. *See* Medical Rs. 7. The

---

[6] Such a referral would probably fall into the category of treatment that is "merely desirable" but not medically necessary or "provided upon a reasonable cost and time basis." *Bowring*, 551 F.2d at 47-48.

relevant sick call, in which Plaintiff complained of pain while urinating, was submitted in January 2017; however, Plaintiff voluntarily declined to follow through with the medical appointment that was arranged in response to his sick call. *See id.* at 7-8. Plaintiff does not allege, nor does the record suggest, that Druckman was or should have been aware of the January 2017 sick call, particularly given Plaintiff's decision not to follow through with the appointment. Since Plaintiff's urinary problems were otherwise unreported between June 29, 2016, and July 17, 2017, there was no reason that Druckman would be aware of Plaintiff's ongoing medical concerns. Thus, during this time period, Druckman lacked the subjective mental state necessary to support an Eighth Amendment claim.

(3) July 17, 2017 and later

Less than two weeks after Plaintiff submitted his sick call request on July 17, 2017, he was seen by Dr. Memarsadeghi, who submitted a request for a urology consult and ordered a urine culture and urinalysis. *Id.* at 11-13. Ultimately, Plaintiff was seen by a urologist and underwent a cystoscopy, although these events did not occur until after Plaintiff filed this Complaint. In any event, Plaintiff does not allege that Druckman was involved in his treatment decisions at this point or was responsible for scheduling his urology consult. Indeed, as noted above, Plaintiff does not suggest that Druckman had knowledge of his medical condition after June 2016. Again, the facts do not support a § 1983 claim against Druckman.

## CONCLUSION

Defendants' dispositive motion is granted. The claim against Wexford is granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The claim against Druckman is granted under Rule 56. A separate order follows.

1/4/2019
Date

Case No. PWG 17-3546
Pitts vs. Druckman, et al.

_____
Paul W. Grimm
United States District Judge